### In the United States District Court
### For The Northern District of Illinois
### Eastern Division

| | |
|---|---|
| JOSEPH W. DENAN, ADRIENNE L. PADGETT, *individually and on behalf of persons similarly situated,* | |
| *Plaintiffs,* | No. _____ |
| *v.* | |
| TRANS UNION, LLC, | |
| *Defendant.* | |

---

## PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT

Plaintiffs, Joseph W. Denan and Adrienne L. Padgett, bring this action, individually and on behalf of others similarly situated, against Defendant, Trans Union, LLC ("TransUnion"). TransUnion has unlawfully reported illegal, void, and uncollectible loans from Plain Green, LLC ("Plain Green") and Great Plains Lending, LLC ("Great Plains") (collectively, "the Payday Lenders") as having a balance due on Plaintiffs' consumer reports in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681i(a) and 1681e(b), violating their legally protected reputational rights and putting them at risk for denial of credit, housing, and/or employment.

### I. Jurisdiction and Venue

1.    This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

2.    Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391 because TransUnion resides in this District and the violations giving rise to Plaintiffs' claims occurred here.

## II. Parties

3.      Plaintiff, Joseph Denan, is a resident of Egg Harbor Township, New Jersey. Mr. Denan brings this action on behalf of himself and a class of similarly situated persons who had void and uncollectible loans from Plain Green, LLC inaccurately reported as having a balance due on their TransUnion credit reports and also on behalf of subclasses who had balances inaccurately reported as past due and whose void and uncollectible loans TransUnion continued to report despite requests that TransUnion reinvestigate and remove the void and uncollectible debts.

4.      Plaintiff, Adrienne L. Padgett, is a resident of Gainesville, Florida. Ms. Padgett brings this action on behalf of herself and a class of similarly situated persons who had void and uncollectible loans from the Payday Lenders inaccurately reported as having a balance due on their TransUnion credit reports, and also on behalf of a subclass who had balances inaccurately reported as past due.

5.      Defendant Trans Union, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois. TransUnion is wholly owned by Trans Union Corp., a Delaware corporation. Trans Union Corp.'s principal place of business is in Chicago, Illinois.

## III. Introduction

6.      Like old-fashioned "loan sharks," online payday and installment lenders'[1] business model is to take advantage of poor (and increasing numbers of middle-class) Americans who have no savings to cover unexpected expenses. They charge unconscionably high interest rates, typically

---

[1] The term "payday loan" is generally recognized as a loan of short duration, typically two weeks, coinciding with the borrower's next payday. An "installment loan" is a small-dollar consumer loan with terms that allow for the repayment of the debt over a period of months, generally with bi-weekly or monthly payment terms. In many states, the consumer finance laws address the legality of "payday loans" and "installment loans" through the same lending statutes. Plaintiffs may refer to the loans and lending practices at issue in this litigation as "payday loans" or "payday lending," even though the loans to Plaintiffs and members of the Class may be more accurately defined as installment loans. Regardless of whether the term "payday loan" or "installment loan" is used hereafter, the lending practices at issue pertain to loans by unlicensed lenders, such as Plain Green and Great Plains, made to borrowers at usurious interest rates in the "Included States," as that term is defined below.

exceeding 300%. Unwitting, or simply desperate, consumers often receive only a few hundred dollars, but end up owing thousands of dollars in interest. These usurious interest rates can make it difficult or impossible for consumers, already in difficult financial straits, to ever free themselves from debt.

7.  Seeking to protect their citizens from such exploitative debt traps, many states have outlawed high-interest, small-dollar loans. Arkansas, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Massachusetts, Montana, New Jersey, New York, North Carolina, Ohio, Oregon, Vermont, Virginia, and West Virginia (the "Included States") have gone even further, passing laws that high-interest loans for amounts of less than $3,000 are void and uncollectible. The Included States so strongly disapprove of usurious payday and installment loans that, as a matter of public policy, their legislatures have decided that purported "loans" in violation of their statutes are not legally due. Attempting to evade these state laws, payday lenders such as Plain Green and Great Plains nevertheless offer high-interest loans to residents of the Included States over the internet.

8.  The Payday Lenders openly admit that they do not follow the Included States' laws. Flouting all legal accountability, they baselessly contend that no state or federal laws may be applied to them because they falsely claim "sovereign immunity" through spurious associations with Native American tribes. Think Finance, LLC, created the Payday Lenders, Plain Green and Great Plains, in association with two Native American tribes, the Chippewa Cree Tribe and Otoe-Missouria Tribe (collectively the "Tribes"), respectively, using the rent-a-tribe business model to falsely claim that the business interests share the privileges and immunities enjoyed by the Tribes. The Tribes, however, receive less than five percent of the business revenue and are in no sense true owners of the Payday Lenders. Moreover, it is well established that Native American tribes (even if the Payday Lenders' were truly sovereign entities) are subject to state consumer-protection laws when they operate businesses outside tribal reservations and deal with state-resident consumers who are not members of the tribes, as the Payday Lenders do.

9.     The three major national credit reporting agencies ("CRAs")—Equifax, Experian, and TransUnion—occupy a key position of trust in modern American financial life. Any American who wishes to apply for a job, a home mortgage, insurance coverage, or any kind of credit is well advised to first check his or her credit report. Inaccurate or negative information on these widely-used, authoritative reports places consumers at risk of being denied credit, a job, or housing, or paying more than they otherwise would for credit or insurance. TransUnion regularly includes information reported by the Payday Lenders in TransUnion's consumer reports, including reporting illegal, void, and uncollectible loans made to residents of the Included States as due and owing.

10.     TransUnion's decision to inaccurately report loans from the Payday Lenders to residents of the Included States as if they were legally valid and collectible is not only objectively inaccurate as a matter of clearly established legal rules, it also adds a veneer of legitimacy to the Payday Lenders' illegal conduct. By placing their major-CRA "stamp of approval" on void and uncollectible loans, and by reporting past-due balances when consumers exercise their legal rights not to repay these illegal loans, TransUnion undermines the Included States' public policy and aids and abets the Payday Lenders' illegal scheme.

11.     Plaintiffs bring this action on behalf of themselves and a Class of all residents of the Included States who TransUnion inaccurately reported had a balance due to the Payday Lenders, as well a Subclass of residents of the Included States whose Online Payday loans TransUnion inaccurately reported as past due. Additionally, Plaintiff Joseph Denan brings this action on behalf of himself and a Subclass of all residents of the Included States who disputed reporting of the illegal loans with TransUnion. Despite the disputes, TransUnion failed to use reasonable reinvestigation practices as required by the FCRA and continued to inaccurately report the illegal loans as due and owing on the Subclass members' credit reports.

12.     All purported loans by the Payday Lenders to residents of the Included States are void and uncollectible as a matter of clearly established law, as TransUnion either knew or recklessly ignored.

13. Despite the fact that these loans are void and uncollectible, TransUnion routinely, systematically reported amounts as having a balance due from the Class members to the Payday Lenders. This systematic policy of reporting void and uncollectible debts as due and owing violates the FCRA's requirement that CRAs follow "reasonable procedures" to ensure the "maximum possible accuracy" of consumer reports. 15 U.S.C. § 1681e(b). Plaintiffs and the Class members accordingly: suffered injuries to their statutorily protected reputational rights, as well as being exposed to the risk that they might be denied a job, housing, credit, or insurance; pay more for credit or insurance than they otherwise would have; or pay debts they did not owe in order to avoid negative information appearing on their credit reports.

### IV. FACTUAL ALLEGATIONS

**A. Inaccurate Statements in Joseph Denan's Credit Report**

**1. Mr. Denan's Loan and Payment History**

14. On or about November 15, 2017, Plaintiff, Joseph Denan, took out a short-term installment loan from Plain Green for $1,600.

15. As TransUnion has known at all times relevant to this suit, Mr. Denan is a resident of the State of New Jersey.

16. At the time of the loan, Plain Green informed Mr. Denan that payments of $187.41 would be withdrawn from his bank account every two weeks.

17. Mr. Denan was not told by Plain Green that (a) it is an unlicensed lender in the state of New Jersey; (b) he would be making 40 payments ending in May 2019; (c) his finance charges for the loan would be $5,894.44; or (d) the annual percentage rate for his loan would be 316.13%, more than ten times the legal interest rate under New Jersey law.

18. Under New Jersey law, Plain Green's purported loan to Mr. Denan is void and uncollectible as a matter of clearly established law. Because Plain Green is not licensed to make loans in New Jersey and because it charges interest at rates that far exceed those permitted by New Jersey law, Mr. Denan has no obligation to make payments to Plain Green.

– 5 –

**2.    TransUnion's Credit Report on Mr. Denan, Dated May 8, 2018**

19.    Plain Green reported to TransUnion that it had made an unsecured loan to Mr. Denan.

20.    At all times relevant to this suit, TransUnion has known that Mr. Denan submitted a request for a void and uncollectible loan from Plain Green on or about November 15, 2017.

21.    TransUnion was aware that Mr. Denan was a New Jersey resident at the time that he completed the Plain Green loan application.

22.    Mr. Denan's TransUnion credit report noted payment delinquencies and a pay status of "Account 60 Days Past Due Date." The credit report includes the following information and chart on the void and uncollectible Plain Green debt:

Date Opened:  November 15, 2017
Date Updated: March 31, 2018
Last Payment: February 26, 2018
Pay Status:      Current; Paid or Paying as Agreed
Maximum Delinquency of 60 days in Feb. 2018 and March 2018 for $404

|  | 03/2018 | 02/2018 | 01/2018 | 12/2017 | 11/2017 |
|---|---|---|---|---|---|
| Balance | $2,689 | | $2,269 | $2,239 | $1,808 |
| Scheduled Payment | $404 | | $404 | $404 | $404 |
| Amount Paid | | | $0 | $0 | $0 |
| Past Due | $404 | | $404 | $404 | $0 |
| Remarks | | | | PNR | |
| Rating | 60 | 60 | 30 | 30 | OK |

**Figure 1: TransUnion's May 8, 2018 Consumer Report Regarding Mr. Denan's Loan[2]**

23.    The TransUnion credit report indicates that the balance due on Mr. Denan's loan was growing at an exponential rate and the $404 "monthly payments" were past due in December 2017, January 2018, and March 2018.

24.    The credit report fails to list any of Mr. Denan's payments as an "amount paid." Instead, it asserts that the first payment was never received.

---

[2] The shading in the table is consistent with the original shading on Mr. Denan's report. According to the TransUnion report, "60" signifies "60 days late"; "30" signifies "30 days late"; "PNR" indicates "first payment never received."

25.   This report is inaccurate because it reports that amounts are "past due" when in fact, under clearly established New Jersey law, Plain Green's purported loan to Mr. Denan is void and uncollectible, and no amounts are due or owing from Mr. Denan to Plain Green.

**3.   Plain Green Communications with Mr. Denan**

26.   On or about April 20, 2018, Mr. Denan contacted Plain Green and offered to pay the principal amount of the loan, which was $1,600.

27.   On May 8, 2018, Plain Green sent an email to Mr. Denan, noting its willingness to resolve the loan for $1,669.98 in payments in addition to the $1,000 Mr. Denan had already paid.

28.   On May 14, 2018, Mr. Denan's counsel sent a letter to Plain Green requesting a copy of the loan documents that had been denied to Mr. Denan as well as his payment history.

29.   In an e-mail to Mr. Denan on May 16, 2018, Plain Green agreed to accept a total of $1,500 in payments on the $1,600 loan that it had made six months earlier.

**4.   Mr. Denan's Dispute of the Plain Green Loan to TransUnion and Its Investigation Results**

30.   In May 2018, Mr. Denan sent a letter to TransUnion's Dispute Team, which stated in part:

> This document will serve as an official dispute of the account PLAIN GREEN LLC #4298 that contains incorrect information on my credit report. This company is an UNLICENSED pay day loan company. They are NOT permitted to grant such loans in the state of NJ and did so without disclosing that fact. . . . Since they illegally issued such a loan in the state of NJ, I believe that the loan is not valid and there was no legal obligation for me to repay any of the loan. . . . With the lack of confidence that consumers are already experiencing with the credit bureaus due to breaches and hacks, it is appalling that your company does business with and allows illegal lenders to utilize your service. I have made several attempts to contact this lender and they will not respond. I would like this information deleted form my report. You may search the website of Plain Green Loans and see that they do not do business in NJ yet they illegally continue to process applications for predatory loans. Your services are meant to protect not only the lender but the consumer as well. You have failed to do so.

31.   TransUnion reportedly conducted an investigation of Mr. Denan's dispute on the Plain Green loan.

32.     On May 16, 2018, TransUnion responded and sent a report with the results of its investigation to Mr. Denan.

33.     TransUnion determined that the disputed loan was "verified as accurate," but it updated Mr. Denan's credit report with new information as of May 15, 2018, as follows:

Balance:            $1,569
High Balance:   $2,689
Date Updated:   May 15, 2018
Last Payment:   May 14, 2018
Pay Status:        Current; Paid or Paying as Agreed
Remarks:            PAYING PARTIAL PMT AGMT
Maximum Delinquency of 60 days in February 2018

|  | 04/2018 | 03/2018 | 02/2018 | 01/2018 | 12/2017 | 11/2017 |
|---|---|---|---|---|---|---|
| **Rating** | X | X | 60 | 30 | 30 | OK |

**Figure 2: TransUnion's Investigation Results**

"60" signifies "60 days late"; "30" signifies "30 days late"; and "X" indicates "Unknown."

34.     Despite a "current" payment history with the most recent payment on May 14, 2018, the TransUnion May 16, 2018 report indicates that Mr. Denan's payment rating is "unknown" for the months of March and April 2018.

35.     TransUnion acknowledged in its May 16, 2018 report that the pay status for the illegal Plain Green loan was current and "paid or paying as agreed"; however, TransUnion inaccurately reported that the total amount due was $1,569.

36.     TransUnion refused to take the Plain Green loan off of Mr. Denan's report.

**5.     TransUnion Continues to Report the Plain Green Loan**

37.     TransUnion continues to report the void and uncollectible Plain Green loan on Mr. Denan's credit report.

38.     On June 24, 2018, TransUnion updated Mr. Denan's credit report with less than one-week of new information from Plain Green (date updated by Plain Green: May 21, 2018), as follows:

Balance:            $1,569
High Balance:   $2,767
Date Updated:   May 21, 2018

Last Payment: May 14, 2018
Pay Status:     Current; Paid or Paying as Agreed
Remarks:        PAYING PARTIAL PMT AGMT
Maximum Delinquency of 60 days in March 2018

|         | 04/2018 | 03/2018 | 02/2018 | 01/2018 | 12/2017 |
|---------|---------|---------|---------|---------|---------|
| **Rating** | C/O | 60 | 30 | 30 | OK |

**Figure 3: TransUnion's June 24, 2018 Consumer Report Regarding Mr. Denan's Loan[3]**

**6.    TransUnion's Report of the Plain Green Loan Harms Mr. Denan's Credit**

39.    TransUnion continues to report 30-day and 60-day delinquencies on Mr. Denan's credit report, despite the fact that, under clearly established New Jersey law, the loan by the unlicensed lender is illegal and uncollectible, and no amounts are due and owing from Mr. Denan to Plain Green.

40.    On May 24, 2018, Mr. Denan spoke with a TransUnion representative about the inaccurately reported delinquencies with Plain Green on his credit report. TransUnion's representative acknowledged that these delinquencies had reduced Mr. Denan's credit score by 37 points.

41.    As a result of TransUnion's reporting of this information, Mr. Denan was denied his statutory right that TransUnion must follow reasonable procedures to assure maximum possible accuracy of the information that it reports about his credit history, violating his legally protected reputational interests and exposing him to a risk of being denied credit, housing, employment, or insurance; of paying more than he otherwise would for credit or insurance; or of paying a debt he does not owe in order to avoid negative information appearing on his credit report.

42.    TransUnion disclosed and reported Mr. Denan's delinquent payment history on Plain Green's void and uncollectible debt to third parties through "regular inquiries" and "account review inquiries."

---

[3] The shading in the table is consistent with the original shading on Mr. Denan's report. According to the TransUnion report, "C/O" signifies "charged-off."

**B. Inaccurate Statements in Adrienne Padgett's Credit Report**

**1. Ms. Padgett's Plain Green Loan and Payment History**

43. On or about January 9, 2018, Plaintiff, Adrienne Padgett, took out a short-term installment loan from Plain Green for $1,600.

44. As TransUnion has known at all times relevant to this suit, Ms. Padgett is a resident of the State of Florida.

45. At the time of the loan, Plain Green informed Ms. Padgett that payments of $196.54 would be withdrawn from her bank account every two weeks.

46. Ms. Padgett was not told by Plain Green that (a) it is an unlicensed lender in the state of Florida; (b) she would be making payments ending in July 2019; (c) her finance charges for the loan would be $6,259.85 (for a total of $7,859.85 in payments on the void and uncollectible loan); or (d) the annual percentage rate for her loan would be 317%, which is more than 15 times the legal interest rate under Florida law and more than seven times the rate defined as criminal usury.

47. Under Florida law, Plain Green's purported loan to Ms. Padgett is void and uncollectible as a matter of clearly established law. Because Plain Green is not licensed to make loans in Florida and because it charges interest at rates that far exceed those permitted by Florida law, Ms. Padgett has no obligation to make payments to Plain Green.

48. Despite the fact that loan is void and uncollectible, Ms. Padgett made a payment of $700 to Plain Green in February 2018.

**2. Ms. Padgett's Great Plains Loan and Payment History**

49. On or about December 15, 2016, Ms. Padgett took out a short-term installment loan from Great Plains for $900.

50. At the time of the loan, Great Plains informed Ms. Padgett that payments of $109.64 would be withdrawn from her bank account every two weeks.

51. Ms. Padgett was not told by Great Plains that (a) it is an unlicensed lender in the state of Florida; (b) she would be making payments through March 2018; (c) her finance charges for the loan would be $2,607.35 (on top of the repayment of principal); or (d) the annual percentage rate

for her loan would be 317%, which is more than 15 times the legal interest rate under Florida law and more than seven times the rate defined as criminal usury.

52. Under Florida law, Great Plains' purported loan to Ms. Padgett is void and uncollectible as a matter of clearly established law. Because Great Plains is not licensed to make loans in Florida and because it charges interest at rates that far exceed those permitted by Florida law, Ms. Padgett has no obligation to make payments to Great Plains.

53. Despite the fact that the loan is void and uncollectible, Ms. Padgett made two payments totaling $219.28 to Great Plains.

**3. TransUnion's Credit Report on Ms. Padgett, Dated June 1, 2018**

54. TransUnion's credit report about Ms. Padgett, dated June 1, 2018, indicates that the Payday Lenders reported to TransUnion that they had made unsecured loans to Ms. Padgett.

**a. Credit Report Data on Ms. Padgett's Plain Green Loan**

55. At all times relevant to this suit, TransUnion has known that Ms. Padgett submitted a request for a void and uncollectible loan from Plain Green on or about January 5, 2018.

56. TransUnion was aware that Ms. Padgett was a Florida resident at the time that she completed the Plain Green loan application.

57. TransUnion's credit report on Ms. Padgett noted payment delinquencies, including the following information and chart on the illegal and void Plain Green debt:

Date Opened:  January 5, 2018
Date Updated: April 30, 2018
Last Payment: February 28, 2018
Pay Status:    Account 30 Days Past Due Date
Remarks:        PAYING PARTIAL PMT AGMT
Maximum Delinquency of 30 days in March 2018 and in April 2018 for $426

| | 04/2018 | 03/2018 | 02/2018 | 01/2018 |
|---|---|---|---|---|
| **Balance** | $2,585 | | $1,513 | $2,005 |
| **Scheduled Payment** | $426 | | $426 | $426 |
| **Amount Paid** | $0 | | $700 | $0 |
| **Past Due** | $426 | | $0 | $0 |
| **Rating** | 30 | 30 | OK | OK |

**Figure 4: TransUnion's Consumer Report Regarding Ms. Padgett's Plain Green Loan**

58. The TransUnion credit report reflects that the balance due on Ms. Padgett's loan was growing at an exponential rate, her payment history was rated as 30-days late for two months, and the $426 "monthly payment" was past due in April 2018.

### b. Credit Report Data on Ms. Padgett's Great Plains Loan

59. At all times relevant to this suit, TransUnion has known that Ms. Padgett submitted a request for a void and uncollectible loan from Great Plains on or about December 15, 2016.

60. TransUnion was aware that Ms. Padgett was a Florida resident at the time that she completed the Great Plains loan application.

61. For the Great Plains loan, Ms. Padgett's TransUnion credit report notes a payment delinquency of 30 days and the status of "Charged Off" [4] for the illegal and void debt. Great Plains reportedly closed the account on April 4, 2017, noting "Maximum Delinquency of 30 days in 02/2017." The credit report also includes the following information and chart on the illegal and void Great Plains debt:

Date Opened: December 15, 2016
Date Updated: April 4, 2017
Last Payment: January 5, 2017
Pay Status: Charged Off
Remarks: PURCHASED BY ANOTHER LENDER;
UNPAID BALANCE CHARGED OFF
Maximum Delinquency of 30 days in February 2017

|  | 04/2017 | 03/2017 | 02/2017 | 01/2017 | 12/2016 |
|---|---|---|---|---|---|
| **Balance** | $0 | | | $1,042 | $915 |
| **Scheduled Payment** | $0 | | | $236 | $236 |
| **Amount Paid** | $0 | | | $109 | $109 |
| **Past Due** | $0 | | | $0 | $0 |
| **Rating** | C/O | C/O | 30 | OK | OK |

---

[4] "In credit reporting industry terms, charged off and written off are considered final status indicators for the account, meaning the account is no longer an active entry in your credit report. . . . The fact that it is a charged off account means it would be scored negatively." https://www.experian.com/blogs/ask-experian/defining-charged-off-written-off-and-transferred/ (last visited July 20, 2018).

– 12 –

**Figure 5: TransUnion's Consumer Report Regarding Ms. Padgett's Great Plains Loan**

### 4. TransUnion's Report of the Loans Harms Ms. Padgett's Credit

62. Ms. Padgett's credit report identifies 30-day delinquencies in the payments to both of the Payday Lenders for illegal and void debts. The report also indicates that one of the debts has been Charged Off and sold to a debt collector.

63. The report is inaccurate because it reports that amounts are "past due" when in fact, under clearly established Florida law, the purported loans to Ms. Padgett are void and uncollectible, and no amounts are or ever were due or owing from Ms. Padgett to either Plain Green or Great Plains.

64. As a matter of clearly established law, no amounts are, or ever were, due and owing from Ms. Padgett to the Payday Lenders, as TransUnion easily could have and should have discovered but knowingly or recklessly ignored.

65. As a result of TransUnion's reporting of this information, Ms. Padgett was denied her statutory right that TransUnion must follow reasonable procedures to assure maximum possible accuracy of the information that it reports about her credit history, violating her legally protected reputational interests and exposing her to a risk of being denied credit, housing, employment, or insurance; of paying more for credit or insurance than she otherwise would have; or of paying money she did not owe in order to avoid negative information appearing on her credit report.

66. TransUnion disclosed and reported delinquent payment history on the Payday Lenders' void and uncollectible debts to third parties through "regular inquiries" and "account review inquiries."

## V. CLASS ALLEGATIONS

### A. TransUnion Must Screen the Furnishers of Credit Data

67. TransUnion must accurately transcribe, store, and communicate consumer information received from a source that it reasonably believes to be reputable.

68. TransUnion must establish and follow procedures to screen potential furnishers of credit data in order to be reasonably certain that the data received is valid and accurate.

69. TransUnion puts prospective furnishers through an initial security screening. Screening generally includes an inspection of features of each business such as its physical headquarters, phone number, website, and business license, as well as company records such as annual reports. The screening process also may include consultation with in-house or third-party investigation services that screen for illegal or unethical business history.

70. After the initial screening and inspections, TransUnion may re-inspect its new furnisher, including re-inspections after risk events such as consumer complaints, suspicious trade lines, variations in data submissions, anomalies, and changes in company ownership.

71. When a credit reporting agency learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems.

**B.  TransUnion Knew or Recklessly Ignored that the Payday Lenders' Loans were Void and Uncollectible in the Included States**

72. Neither of the Payday Lenders is a licensed lender in any of the Included States (or, indeed in any state in the United States).

73. The Payday Lenders operate via the internet in the Included States (and, indeed in every state in the United States).

74. The Payday Lenders provide unlicensed lending services to borrowers

75. The list of lenders licensed to make loans in the Included States is publicly available information. The Nationwide Multistate Licensing System ("the NMLS") is a nationwide platform and the leading public resource for evaluating whether a lender is licensed. www.nmlsconsumeraccess.org (last visited July 20, 2018). The NMLS is the system of record for non-depository, financial services licensing or registration in participating state agencies, and it is the official system for companies and individuals seeking to apply for, amend, renew and surrender

license authorities managed through NMLS by 63 state or territorial governmental agencies. https://mortgage.nationwidelicensingsystem.org/about/Pages/default.aspx (last visited July 20, 2018).



https://mortgage.nationwidelicensingsystem.org/news/Pages/ExpandedUse.aspx (last visited July 20, 2018).

76. Additionally, most of the Included States have regulatory authorities that make information about lenders' license status available to the public, including for example: Arizona Department of Financial Institutions, Arkansas Securities Department, Connecticut Department of Banking, Florida Department of Financial Regulation, Georgia Industrial Loan Commissioner, Georgia Department of Banking, Illinois Department of Financial and Professional Regulation, Indiana Department of Financial Institutions, State Bank Commissioner of Kansas, Maryland

Department of Financial Regulation, Massachusetts Division of Banks, New Jersey Department of Banking, New York Department of Financial Services, North Carolina Commissioner of Banks & Financial Institutions, Ohio Department of Commerce, Oregon Department of Financial Regulators, Pennsylvania Department of Banking and Securities, Virginia Bureau of Financial Institutions , and West Virginia Department of Financial Institutions.

77. Plain Green's website plainly discloses, as TransUnion in the exercise of minimal diligence could have and should have discovered but knowingly or recklessly ignored, that the interest rates it charges are in excess of the applicable statutory interest-rate caps in all of the Included States:

> a. "Your loan's total cost depends upon the amount that you're approved for and your payment history. For example, the Annual Percentage Rate (APR) for a loan of $700 is 413.00% with 24 bi-weekly payments of $106.43." https://plaingreenloans.com/Faq.aspx (last visited July 20, 2018).

> b. The loan calculator for Plain Green's lending practices indicates loan repayment at a rate of 438% interest. https://plaingreenloans.com/LoanCost.aspx (last visited July 20, 2018).

78. Similarly, in an exercise of minimal diligence, TransUnion should have discovered that Great Plains makes loans at interest rates that are greatly in excess of the Included States' statutory interest-rate caps:

> a. The Great Plains "Home Page" states: "First-time Great Plains Lending customers typically qualify for an installment loan of $100 to $1,000 with an APR of 328.11% to 448.76%, which is less than the average 662.58% APR for a typical payday loan. For example, a $500 loan from Great Plains at 328.11% APR would require 16 bi-weekly installment payments of $74.18. After the 16th successful payment, your loan would be paid in full. An average payday loan of $500 with an APR of 662.58% and a fourteen (14) day term would require one payment of $627.07. Average payday loan pricing is based on Texas-originated loans facilitated

– 16 –

by Credit Service Organizations/Credit Access Businesses such as CashNet USA®
(664.30%), ChecknGo® (661.75%) and Ace Cash Express® (661.69%) as of May 19,
2016." https://www.greatplainslending.com (last visited July 20, 2018).

b. "Your total cost depends upon the size of the loan for which you qualify and your
payment history. As an example, the Annual Percentage Rate (APR) for a loan of
$500 is 328.11%, with 16 bi-weekly payments of $74.18.
https://www.greatplainslending.com/faq (last visited July 20, 2018).

c. The Great Plains loan calculator indicates that it charges 448.76% interest for loans
of $400 or less. https://www.greatplainslending.com/loan-cost-and-terms (last
visited July 20, 2018).

79. The Payday Lenders' unlicensed practice of extending high-interest loans, which are
void and uncollectible as a matter of law in the Included States, has been the subject of national
news, such as:

> Payday loans typically come with high interest rates that can add
> hundreds or thousands of dollars to the original loan amount and
> trap poor borrowers in a cycle of debt. For this reason, ***many states
> have cracked down on payday lenders. Fourteen states and the
> District of Columbia ban payday loans altogether, and all of the
> remaining states regulate payday lending to some degree***. . . .
>
> "Too many hardworking people are trapped by the manipulative
> tactics of payday lenders, from exorbitant interest rates to deceptive
> debt collection practices," New York Attorney General Eric
> Schneiderman told The Huffington Post. "Law enforcement
> agencies must stay vigilant in order to protect families from
> scammers and illegal lenders looking to exploit them." . . . .
>
> Plain Green makes small, short-term, high-interest loans to people
> all over the country who have no other source of credit. Although
> the company is nominally owned by the Chippewa Cree, the tribe
> has little actual involvement in its operations and receives a tiny
> fraction of the revenue generated by the business.
>
> The tribe has received an estimated $28 million to $32 million from
> Plain Green since it was created, according to documents obtained

by HuffPost that were filed in tribal court as part of a case between the tribe's former chairman and other tribal leaders that involves the agreement with Think Finance. A March 11, 2011, agreement between the tribe and Think Finance submitted as an exhibit in that case says that Plain Green had received 4.5 to 5.5 percent of the revenues collected by the operation, meaning Think Finance and other third parties received an estimated $500 million to $700 million. . . .

"***The very purpose of an online lender affiliating with a tribe is specifically and expressly so that they can lend in violation of state laws,***" Ellen Harnick, a payday lending expert at the Center For Responsible Lending, told HuffPost. And it's the poorest Americans — the ones who need quick cash to address the most pressing issues in their lives — who are most at risk.

***State regulators have taken numerous measures to protect borrowers, passing laws limiting the size and frequency of short-term loans and setting maximum interest rates that lenders can charge borrowers. Laws in 14 states and D.C. that outlaw payday lending make online, high-interest installment lending illegal as well.*** The Consumer Financial Protection Bureau is also in the midst of writing the first federal payday lending regulations. . . .

The Think Finance-Plain Green business model is representative of these growing online payday lending operations. The loans, and millions of dollars of fees paid to Think Finance, pass through Plain Green and circumvent state regulations, while the real work of running the lending business happens elsewhere. Thanks to Think Finance's online lending platform, Plain Green is able to make loans all over the country. Eventually, the loans end up owned by a Cayman Islands servicing company. And Plain Green, which cites the Chippewa Cree's sovereignty in its lending agreement with customers, says that state and federal regulators have no legal standing to complain. . . . After entering into its arrangement with the Chippewa Cree, Think Finance also made deals with two other tribes: the Otoe-Missouria in Oklahoma, which run Great Plains Lending, and the Tunica-Biloxi in Louisiana, which run MobiLoan.

Ben Walsh, "Outlawed By The States, Payday Lenders Take Refuge On Reservations," (posted June 29, 2015, updated Dec. 6, 2017) https://www.huffingtonpost.com/2015/06/29/online-payday-lenders-reservations_n_7625006.html (emphasis added) (last visited July 20, 2018).

80. The Payday Lenders' illegal practices have been well-recognized for more than five years. For example, in June 2012, the U.S. Consumer Financial Protection Bureau issued Civil Investigative Demands to Plain Green, Great Plains, and one other payday lender, investigating unlawful practices relating to the advertising, marketing, provision and collection of small-dollar loan products in violation of Federal consumer protection laws. The CFPB investigation led to litigation against the Payday Lenders' loan originator, Think Finance, for its "participation in the collection of void loans." https://files.consumerfinance.gov/f/documents/cfpb_think-finance_complaint_112017.pdf (last visited July 20, 2018). The litigation received media attention that TransUnion knew about or recklessly ignored:

> The Consumer Financial Protection Bureau filed a lawsuit against Think Finance LLC, alleging the company collected payments on debts consumers did not owe.
>
> The CFPB's complaint, filed in United States District Court District of Montana, alleges that Think Finance, an online loan servicer based in Addison, Texas, "collects on loans that are void under state laws governing interest rate caps or the licensing of lenders," according to a news release from the CFPB. The loans are void under laws in 17 states.
>
> These actions are violations of the Dodd-Frank Act and Consumer Protection Act, according to the CFPB.
>
> "The bureau alleges that Think Finance made deceptive demands and illegally took money from consumers' bank accounts for debts that were not legally owed. The CFPB seeks to recoup relief for harmed consumers and impose a penalty," the news release said.
>
> Think Finance has extended credit and collected payments online since 2011 and also provides software technology, analytics and marketing services to financial clients in the consumer lending industry, according to the complaint. The company also provides similar services, including extending credit and collecting payments, on behalf of three lending businesses owned by Native American Tribes: Great Plains Lending LLC, MobiLoans LLC and Plain Green LLC, according to the complaint.

> Specifically, the CFPB alleges that Think Finance charged interest rates "high enough to violate usury laws in some states where they did business and violation of these usury laws renders particular loans void."

> The company also allegedly did not obtain licenses to issue loans or collect payments in certain states, a practice that also renders particular loans void, and made electronic withdrawals from consumers' bank accounts and demanded payments by phone or in writing.

https://www.acainternational.org/news/cfpb-files-federal-lawsuit-against-online-loan-servicer

(last visited July 20, 2018).

81. Additionally, the Payday Lenders have been the subject of reports related to their marketing and lending practices in the context of other litigation:

> Great Plains Lending and Plain Green Loans have stopped marketing new loans pending the outcome of a court case in which the NY Attorney General sued another payday lender for offering loans in the State of New York. Both these lenders are operated by Think Finance as tribal entities under the premise that they can export their tribal laws into states. The New York regulator's position is that it has the authority to regulate tribal lenders doing business in New York. They sent cease-and-desist orders to many online payday lenders offering loans New York.

> Both Great Plains Lending and Plain Green Loans stopped marketing in the middle of August 2013 and very briefly re-started marketing on Oct 1, 2013 but quickly stopped again after The U.S. District Court for the Southern District of New York ruled in favor of New York. It ruled that the state can regulate lenders making loans to New York state residents even when loans are originated from offices on tribal land.

> Since reporting on this change at the end of 2013 we have not seen a change in marketing from either Great Plains Lending or Plain Green Loans. There has been a notable industry-wide shift away from the tribal lending model. Or, to be more specific, we have seen tribal lenders taking a more stealth mode to marketing while new entrants have entered the space but are all pursuing the state license path. It appears Think Finance, the main operators of Great Plains and Plain Green, is taking the same approach. They continue to

> invest online marketing dollars into, Rise Credit, their other short-
> term loan business, while stopping with the other two.

https://www.thepaydayhound.com/learn/great-plains-lending-and-plain-green-loans-stop-marketing/ (originally published Oct. 3, 2013; updated Nov. 14, 2015) (last visited July 20, 2018).

82. The Payday Lenders admit in their standard loan agreements that they do not follow the laws of the Included States (or any United States state or federal law), instead claiming, that they are not subject to the laws of any state of the United States. Flouting the consumer-protection authority of the sovereign states in which they do business, the Payday Lenders entirely ignore state law and see United States federal law as an optional, non-binding "guideline," stating in their standard loan agreements that they will "voluntarily use certain federal laws as guidelines for the provision of services."

83. Plain Green and Great Plains hold themselves out as tribal governmental lending arms of the Chippewa Cree Tribe of the Rocky Boy's Reservation in Montana and the Otoe Missouria Tribe of Indians in Oklahoma, respectively. However, they plainly do business in the Included States—off of the tribal reservations and, thus, beyond the Tribal sovereign legal authorities. Moreover, the Payday Lenders have a high-volume internet business, extending loans outside tribal lands with citizens of the Included States, who are not members of the Tribes. It is well established that even if the Payday Lenders were sovereign entities, they are subject to applicable state and federal law when they conduct business outside of tribal lands with consumers who are not members of the tribe. *See Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

## C. TransUnion Knowingly Adds Inaccurate Data about the Payday Lenders' Void and Uncollectible Loans to Consumers' Credit Reports

84. TransUnion is a consumer reporting agency that provides consumer reports to employers, landlords, and creditors.

85. The Payday Lenders contract with TransUnion to furnish consumer credit data.

86. To obtain the ability to compile and furnish credit data about their borrowers to TransUnion, the Payday Lenders had to undergo an application process, pay a membership fee, and obtain corporate software from TransUnion.

87. In the process of applying to TransUnion for furnisher status, the Payday Lenders had to provide information about their business practices, which may have included on-site inspection(s) by TransUnion representatives.

88. Through the application and screening process and/or its re-inspection regarding the Payday Lenders, TransUnion knew or should have known:

a. The Payday Lenders are not licensed to make loans in the Included States;

b. The Payday Lenders charge interest on their loans at rates that are usurious and illegal based on the laws of the Included States; and

c. The Payday Lenders have no legal basis to pursue collection of their borrowers' debts in any United States state or federal court in the Included States.

**D. State Laws Prohibit the Collection of High-Interest Loans by Unlicensed Lenders**

89. Many states have enacted strict laws that govern the terms of short-term, small-dollar consumer loans, often referred to as "payday" loans or "installment" loans. State lending laws usually limit the amount of interest that can be legally charged and often impose licensing and/or regulatory requirements on lenders. Some states outlaw the concept of payday lending, while others impose civil and criminal usury penalties for violation of state laws. Such laws reflect the states' strong public policies to protect state residents from abusive lending practices.

90. The Included States have passed laws that loans made in violation of the interest rate caps and/or licensure requirements are void as a matter of law, and the lender has no right to collect any principal, interest, or other charges. In other words, if a lender ignores the law and makes an illegal loan, the borrower has no obligation to repay the loan, and the lender has no legal basis to collect money from consumers. These Included States are:

91. **Arizona**. In Arizona, there is an interest rate cap of 36 percent plus a five percent finance fee. ARIZ. REV. STAT. § 6-632 (Consumer Lenders Act). "[A] person, whether located in [Arizona] or in another state, shall not engage in the business of a consumer lender without first being licensed," and this licensing requirement cannot be avoided by "any device, subterfuge or pretense." ARIZ. REV. STAT. § 6-603(A) and (B). If a lender makes a loan of $10,000 or less without a license, the unlicensed lender has no right to collect any principal, finance charges, or other fees in repayment of the consumer's loan. ARIZ. REV. STAT. §§ 6-601(5)-(7), 6-602(B), 6-603(A), 6-613(B).

92. **Arkansas**. Under Arkansas law, interest charged on consumer loans may not exceed an annual rate of 17 percent. ARK. CONST. amend. 89, § 3; ARK. CODE ANN. §§ 4-57-104, 4-57-105. All contracts "having a rate of interest in excess of the maximum lawful rate shall be void as to principal and interest." ARK. CONST. amend. 89, § 6(b).

93. **Florida**. Consumer loans by an unlicensed lender to Florida residents may not exceed 18 percent. FLA. STAT. §§ 516.01(2), 516.03, 516.031. Any loan agreement that charges interest at a rate greater than permitted by statute is not enforceable. FLA. STAT. §§ 516.02(2)(c), 687.071(7).

94. **Georgia**. For loans of $3,000 or less with interest charged at an annual rate exceeding eight percent, the lender must be licensed by the state. GA. CODE ANN. §§ 7-3-6, 16-17-2. Otherwise, the lender is in violation of the Georgia Industrial Loan Act and the Payday Lending Act. *Id.* Under such circumstances, the lender is barred from collecting on the indebtedness, because such transactions are "void *ab initio.*" GA. CODE ANN. §§ 7-3-29(a), 16-17-2, 16-17-3.

95. **Illinois**. Under the Illinois Consumer Installment Loan Act, a lender must be licensed to engage in the business of making loans of $40,000 or less, including "small consumer loans" of $4,000 or less. 205 ILL. COMP. STAT. §§ 670/1, 670/15(b). Lenders cannot charge more than 99% interest, even if they are licensed. 205 ILL. COMP. STAT. §§ 670/15(b), 670/17.2(a)(1); *see also* 815 ILL. COMP. STAT. § 205/4(1). If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right

to collect, receive, or retain any principal, interest, or charges related to the loan." 205 ILL. COMP. STAT. § 670/20(d).

96. **Indiana**. Under Indiana law, if a lender makes a consumer loan without first obtaining a license, "the loan is void and the debtor is not obligated to pay either the principal or loan finance charge." IND. CODE §§ 24-4.5-3-502(3), 24-4.5-5-202.

97. **Kansas**. A lender must be licensed to engage in the business of making supervised consumer loans. KAN. STAT. ANN. § 16a-2-301(1). If an unlicensed lender makes such a loan, the loan is void and uncollectible. KAN. STAT. ANN. § 16a-5-201(2).

98. **Maryland**. The interest rate charged to a Maryland borrower may not exceed 33 percent per year. MD. CODE, COM. LAW § 12–306(a)(6)(i), 12–313(a)(1), 12–314(a), 12–314(c). If the interest or fees exceed this amount, the loan is unenforceable, and the lender may not receive or retain any principal, interest, or other compensation for the loan. MD. CODE, COM. LAW § 12–314(b). It is also illegal to attempt to collect principal or interest on a loan that was made by an unlicensed lender. MD. CODE, FIN. INSTITUTIONS LAW § 11–204; MD. CODE, COM LAW § 12–302; *see also* Md. Collection Agency Licensing Bd., Advisory Notice, Unlicensed Consumer Loan and Prohibited "Payday" Loan Collection Activity (July 20, 2009).

99. **Massachusetts**. In Massachusetts, for loans by an unlicensed lender for $6,000 or less where the interest and expenses on the loan exceed 12 percent per year, the lender (or subsequent purchaser of the loan) has no right to collect money for repayment of the loan, including its principal. MASS. GEN. LAWS ch. 140, §§ 96, 103, 110; MASS. GEN. LAWS ch. 209, § 26.01; MASS. GEN. LAWS ch. 271, § 49. Any loan made by an unlicensed lender in violation of Massachusetts law is void. MASS. GEN. LAWS ch. 140, §§ 96, 110.

100. **Montana**. A lender must be licensed to engage in the business of making consumer loans. MONT CODE. ANN. § 32-5-201(1). If an unlicensed lender makes such a loan, the loan is void, and the lender "does not have the right to collect, receive, or retain any principal, interest, fees, or other charges." MONT. CODE ANN. § 32-5-103(4).

101. **New Jersey**. New Jersey law requires that all consumer lenders be licensed in the state. N.J. STAT. ANN. § 17:11C-3(a). A loan made without the requisite license is void, and "the lender shall have no right to collect or receive any principal, interest or charges." N.J. STAT. ANN. § 17:11C-33(b).

102. **New York**. New York prohibits any person or corporation not licensed by the state of New York from charging, taking, or receiving any interest at a rate exceeding annual interest of 16% on covered loans. N.Y. GEN. OBLIG. LAW § 5-501; N.Y. BANKING LAW § 14-a(1). Loans that exceed the maximum allowable interest rate are void. N.Y. GEN. OBLIG. LAW § 5-511; N.Y. BANKING LAW § 356; *see also Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y. 1986) ("[A] usurious transaction is void ab initio . . .").

103. **North Carolina**. In North Carolina, the maximum legal rate of interest may not exceed 36 percent. N.C. GEN. STAT. §§ 53-173, 53-176(a). Additionally, lenders must be licensed by the state to make loans of $15,000 or less. N.C. GEN. STAT. §§ 53-166(a). Loans that violate these provisions are void, and the lender has no right to collect, receive, or retain any principal, interest, or other charges. N.C. GEN. STAT. § 53-166(d).

104. **Ohio**. In Ohio, no person shall engage in the business of lending money in the amount of $5,000 or less without first having obtained a license. OHIO REV. CODE ANN. § 1321.02. Any loan made without the requisite license is void, and "the lender has no right to collect, receive or retain any principal, interest or charges." OHIO REV. CODE ANN. § 1321.02.

105. **Oregon**. Under Oregon law, a lender must be licensed to make a loan of $50,000 or less, unless the annual interest rate does not exceed the greater of 12 percent or five percent in excess of the discount rate. OR. REV. STAT. §§ 82.010, 725.045; *see also* OR. REV. STAT. § 725A.020(2) (license requirement for payday loan). Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. OR. REV. STAT. § 725.045(1)(b).

106. **Vermont**. Vermont imposes a tiered set of interest-rate limits, dependent on the amount of the consumer loan – 24 percent on the first $1,000 and 12 percent on the remainder, or

18 percent, whichever rate is greater. VT. STAT. ANN. tit. 8, § 2230. Additionally, lenders must be licensed by the state to make loans. VT. STAT. ANN. tit. 8, § 2201. Loans that violate these provisions are void, and the lender has no right to collect on the loan. VT. STAT. ANN. tit. 8, § 2215(d)(1).

107. **Virginia**. In Virginia, a person may not charge an annual interest rate exceeding 12 percent without first obtaining a consumer finance license from the Commonwealth VA. CODE §§ 6.2-1501(A), 6.2-303(A). It is illegal for an unlicensed lender or its affiliated entities to collect or receive any principal, interest, or charges on a loan with interest in excess of 12 percent; such agreements are void *ab initio* under Virginia law. VA. CODE § 6.2-1541(A) ("A loan contract shall be void if any act has been done in the making or collection thereof that violates § 6.2-1501.").

108. **West Virginia**. Under West Virginia law, a lender must be licensed to make a loan at an interest rate that exceeds 18 percent interest. W.VA. CODE §§ 46A-1-102(38), 46A-4-101. Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. W.VA. CODE § 46A-5-101(2).

109. The Payday Lenders charge interest rates far in excess of 36 percent on all of their loans and are not licensed to extend loans in the Included States. Thus, in the Included States – Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Massachusetts, Montana, New Jersey, New York, North Carolina, Ohio, Oregon, Vermont, Virginia, and West Virginia – the Payday Lenders' loans are void and uncollectible as a matter of clearly established law.

### E.   Congress Regulates the Reporting of Adverse Information to Protect Consumers

110. In enacting the FCRA, Congress has determined that consumers' rights to have truthful information reported about their financial affairs—which has long been protected by the common-law torts of libel, defamation, and slander—merits additional, stricter statutory protections in the credit-reporting context. A person's reputation as reflected in his or her credit report is vitally important to participating in the central activities of life in the United States. Employers, lenders, and landlords use consumer reports to screen applicants, borrowers, and

tenants. Inaccurate, adverse, or derogatory information on a credit report invades consumers' statutory reputational rights and puts consumers at risk of being denied a job, credit, housing, or access to other means by which to live; of paying more than they otherwise would for credit or insurance; or of paying money they do not owe in order to avoid negative information appearing on their credit reports.

111. A "consumer" is defined in the FCRA as "an individual." 15 U.S.C. § 1681a(c). A "consumer report" is defined in the FCRA as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumers eligibility for... credit." 15 U.S.C. § 1681a(d).

112. A consumer reporting agency is any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. 15 U.S.C. §1681a(f).

113. Recognizing that the content of consumer reports can have a significant impact on people's lives, Congress has chosen to regulate the procurement, use, and content of those reports through the FCRA, 15 U.S.C. §§ 1681a, *et seq.*

114. The FCRA is intended "to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union LLC*, 617 F.3d 688, 706 (3d Cir. 2010).

115. To achieve its goals, Congress has required that CRAs "follow reasonable procedures" ... "to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

### F.   The Class and Subclasses

116. Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 for the following Class and Subclasses:

**Class**:

All persons residing in Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Massachusetts, Montana, New Jersey, New York, North Carolina, Ohio, Oregon, Vermont, Virginia, and West Virginia (the "Included States"), who took out a purported loan from either or both Plain Green, LLC and/or Great Plains Lending, LLC ("the Payday Lenders") for $3,000 or less and have had a consumer report prepared by TransUnion during the past five years in which TransUnion reported that there was a balance due to either or both of the Payday Lenders.

**Past Due Subclass:**

All persons residing in the Included States who took out a purported loan from either or both of the Payday Lenders for $3,000 or less and have had a consumer report prepared by TransUnion during the past five years in which TransUnion reported that an amount was past due to either or both of the Payday Lenders.

**Reinvestigation Subclass:**

All persons residing in the Included States (1) who took out a purported loan from the Payday Lenders for $3,000 or less, (2) who have had a consumer report prepared by TransUnion during the past five years in which TransUnion reported that there was a balance due to either or both of the Payday Lenders, (3) who sent a dispute letter to TransUnion regarding its reporting of a balance due to the Payday Lenders, and (4) whose consumer reports prepared by TransUnion continued to include the disputed information after 30 days from the date that TransUnion received the dispute letter.

Excluded from the Class and Subclasses are any employees, officers, or directors of TransUnion, any attorneys appearing in this case, and any judges assigned to hear this case as well as their immediate family and staff.

117. **Ascertainability**. The Class, Past Due Subclass, and Reinvestigation Subclass are ascertainable in that they comprise individuals who can be identified by reference to purely

objective criteria, including information from consumer report files in TransUnion's business records. The relevant information to determine Class and Subclass membership includes (1) all consumer credit reports that indicate a balance due on a purported loan from the Payday Lenders; (2) all consumer reports that indicate amounts were past due from one or both of the Payday Lenders; (3) all consumer files containing a dispute letter contesting the illegal and void debt to Great Plains or Plain Green; and (4) the addresses of the subject consumers. Notice may be mailed to Class and Subclass members using the information in TransUnion's files, as updated through the National Change of Address Registry and other commercially available means.

118. **Numerosity**. The Class and Subclasses are so numerous that joinder of all members is impracticable. Although the precise number of Class and Subclass members is not currently known, the large numbers of people who have been the victims of high-interest, illegal loans by the Payday Lenders, and the near-ubiquity of TransUnion's credit reporting in American commercial life, including its use by employers, landlords, and lenders of all kinds throughout the United States, shows that the Class and Subclasses likely consist of at least thousands of persons and, therefore, it would be impracticable to bring all these persons before the Court as individual plaintiffs.

119. **Typicality**. Plaintiff Joseph Denan's claims are typical of the claims of each member of the Class, Past Due Subclass, and Reinvestigation Subclass he seeks to represent, and Plaintiff Adrienne Padgett's claims are typical of the Class and Past Due Subclass. These claims all arise from the same operative facts and are based on the same legal theories.

120. **Adequacy of Representation**. Plaintiffs will fairly and adequately protect the interests of the Class, Past Due Subclass, and Reinvestigation Subclass. Plaintiffs are committed to vigorously litigating this matter, and their interests are aligned with those of the Class and Subclasses whom they represent. Plaintiffs have retained counsel experienced in handling FCRA and consumer class actions.

121. **Commonality and Predominance**. Common issues of law and fact exist regarding Plaintiffs and the Class members' claims, including:

(a) whether the Payday Lenders are licensed lenders in the Included States;

(b) whether the Payday Lenders' loans are void and uncollectible in the Included States;

(c) whether the Payday Lenders' loans are extended at interest rates that exceed the maximum legal rate in the Included States;

(d) whether TransUnion violated 15 U.S.C. § 1681e(b) by reporting the Payday Lenders' loans on Class members' consumer reports;

(e) whether TransUnion violated 15 U.S.C. § 1681e(b) by reporting the Payday Lenders' loans were past due and/or owing on Class members' consumer reports;

(f) whether TransUnion violated 15 U.S.C. § 1681i(a) by failing and/or refusing to follow reasonable reinvestigation procedures for ascertaining the accuracy of information pertaining to debts purportedly owed to the Payday Lenders in Class members' consumer reports; and

(g) whether TransUnion's violations were negligent, intentional, willful, or malicious.

122. **Superiority**. A class action is a superior method for the fair and efficient adjudication of this controversy. The interest of Class and Subclass members in individually controlling the prosecution of separate claims against TransUnion is small, as actual damages would be difficult and expensive to prove and the maximum statutory damages recoverable by any one Class member is limited to $1,000 under the FCRA. Management of the Class's claims in a single proceeding will avoid inconsistent judgments and result in a more efficient use of judicial resources than resolving these same issues in many individual cases.

123. **Injunctive Relief Appropriate to the Class**. Fed. R. Civ. P. 23(b)(2). This action should also be maintained as a class action because TransUnion has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VI. Causes of Action

### Count One – Reporting of Illegal and Void Debts to Payday Lenders is a Willful Violation of 15 U.S.C. § 1681e(b)

### (On behalf of Plaintiffs and the Class)

124. Plaintiffs restate each of the allegations in the preceding paragraphs as if fully set forth here.

125. TransUnion is a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

126. Plaintiffs and members of the Class are "consumers" as that term is defined by 15 U.S.C. § 1681a(c).

127. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

128. TransUnion violated the FCRA, 15 U.S.C. § 1681e(b), by inaccurately reporting balances due to the Payday Lenders on Class members' consumer reports, despite the fact that reasonable procedures designed to ensure the maximum possible accuracy of the information would have shown that the Payday Lenders' purported loans to the Class members were void and uncollectible.

129. TransUnion's FCRA violations are willful because TransUnion knew or recklessly ignored the clearly established law making the Payday Lenders' loans void and uncollectible in the Included States.

130. It was objectively unreasonable for TransUnion to knowingly and/or recklessly report this data in light of the clearly established state laws.

131. TransUnion's conduct has injured Plaintiffs and the Class members by depriving them of their statutorily protected reputational rights and/or putting them at risk of being denied employment, housing, insurance or credit; of paying more than they otherwise would for credit or insurance; or of paying a debt they did not owe to avoid negative information appearing on their

credit reports. The conduct, action, and inaction of TransUnion were willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

132. Plaintiffs and other members of the Class are entitled to recover costs and attorneys' fees as well as appropriate equitable relief in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

### COUNT TWO – Reporting of Illegal and Void Debts as Past Due is a Willful Violation of 15 U.S.C. § 1681e(b)

### (On behalf of Plaintiffs and the Past Due Subclass)

133. Plaintiffs restate each of the allegations in the preceding paragraphs as if fully set forth here.

134. TransUnion violated the FCRA, 15 U.S.C. § 1681e(b), by inaccurately reporting amounts as past due and/or owing to the Payday Lenders on the Past Due Subclass members' consumer reports, despite the fact that reasonable procedures designed to ensure the maximum possible accuracy of the information would have shown that the Payday Lenders' purported loans to the Subclass members were void and uncollectible.

135. TransUnion's FCRA violations are willful because TransUnion knew of or recklessly ignored the clearly established law making the Payday Lenders' loans void and uncollectible in the Included States.

136. It was objectively unreasonable for TransUnion to knowingly and/or recklessly report this data in light of clearly-established state laws.

137. TransUnion's conduct has injured Plaintiffs and the Past Due Subclass members by depriving them of their statutorily protected reputational rights and/or putting them at risk of being denied employment, housing, insurance or credit; of paying more than they otherwise would for credit or insurance; or of paying a debt they did not owe to avoid negative information appearing on their credit reports. The conduct, action, and inaction of TransUnion were willful, rendering it

liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

138. Plaintiffs and other members of the Past Due Subclass are entitled to recover costs and attorneys' fees as well as appropriate equitable relief in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

### Count Three – Willful Violation of 15 U.S.C. § 1681i(a)
### (On behalf of Plaintiff Joseph Denan and the Reinvestigation Subclass)

139. Plaintiffs restate each of the allegations in the preceding paragraphs as if fully set forth here.

140. In violation of the FCRA, 15 U.S.C. § 1681i(a), TransUnion has failed to use reasonable reinvestigation practices for ascertaining the accuracy of information relating to Plaintiff Joseph Denan's and the Reinvestigation Subclass's illegal and void debts to the Payday Lenders.

141. As a result of TransUnion's failure to conduct reasonable reinvestigations in accordance with the requirements of 15 U.S.C. § 1681i(a), TransUnion has continued to inaccurately report the illegal and void debts of Plaintiff Joseph Denan and the Reinvestigation Subclass, after having been notified that they are disputing that information.

142. TransUnion's failure to comply with the requirements of 15 U.S.C. § 1681i(a) is willful within the meaning of 15 U.S.C. § 1681n(a), rendering it liable for statutory and punitive damages in an amount to be determined by the Court.

143. Plaintiff Joseph Denan and other members of the Reinvestigation Subclass are entitled to recover costs and attorneys' fees as well as appropriate equitable relief in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

### VII. Conclusion and Prayer

144. Wherefore, Plaintiffs Joseph Denan and Adrienne Padgett, individually and on behalf of others similarly situated, pray for judgment ordering relief as follows:

(a) certifying the Class, Past Due Subclass, and Reinvestigation Subclass pursuant to Federal Rule of Civil Procedure 23(b)(3) and/or 23(b)(2);

(b) appointing Plaintiffs to represent the Class and the Past Due Subclass;

(c) appointing Mr. Denan to represent the Reinvestigation Subclass;

(d) appointing Plaintiffs' counsel as Class Counsel;

(e) declaring that TransUnion is financially responsible for notifying all Class members about this suit;

(f) enjoining TransUnion from further violations of 15 U.S.C. § 1681e(b);

(g) finding that TransUnion's violations of 15 U.S.C. § 1681e(b) were willful;

(h) finding that TransUnion's violations of 15 U.S.C. § 1681i(a) were willful;

(i) awarding Plaintiffs and the Class and Subclass members actual damages pursuant to 15 U.S.C. § 1681o, punitive damages, consequential damages, and statutory damages pursuant to 15 U.S.C. § 1681n;

(j) awarding Plaintiffs and the Class and Subclass members pre-judgment and post-judgment interest;

(k) awarding Plaintiffs and the Class and Subclass members reasonable attorneys' fees, expenses, and costs of suit, pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o(a)(2), the common fund theory, or any other applicable statute, theory, or contract;

(l) granting leave to amend the Complaint to conform to the evidence produced at trial; and

(m) awarding such other relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs, Joseph Denan and Adrienne Padgett, demand a trial by jury on all claims so triable.

Dated: July 23, 2018                          Respectfully submitted,

                                              */s/ Michael A. Caddell*
                                              Michael A. Caddell
                                              Cynthia B. Chapman
                                              John G. Jacobs
                                              Bryan G. Kolton

Michael A. Caddell
mac@caddellchapman.com
Cynthia B. Chapman
cbc@caddellchapman.com
John B. Scofield, Jr. (*pro hac vice* forthcoming)
jbs@caddellchapman.com
Amy E. Tabor (*pro hac vice* forthcoming)
aet@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston TX 77007-1722
Telephone: 713-751-0400
Facsimile: 713-751-0906

John G. Jacobs
jgjacobs@jacobskolton.com
Bryan G. Kolton
bgkolton@jacobskolton.com
JACOBS KOLTON, CHARTERED
150 North Michigan Avenue, Suite 2800
Chicago, Illinois 60601
Telephone:  312-427-4000
Facsimile:  312-268-2425

*Attorneys for Plaintiffs*